## CROSBY v. STRATTON.

1. **Trover—Possession—Title.**

   To sustain an action of trover there must be in plaintiff at the time of the supposed conversion a lawful possession, or the right to immediate possession. There must be an invasion of a legal, as contradistinguished from an equitable, right. There can be no conversion of property, the title to which consists only in the right at some future time to acquire it by purchase.

2. **Corporations—Stockholders—Right to Purchase Stock— Trover.**

   The right of a stockholder to purchase a certain proportion of a certain amount of stock to be sold by the corporation does not give the stockholder a right to any specific shares of stock, and would not support an action in trover against another stockholder, who purchased more than his proportional part of the stock, for the excess of stock so purchased.

3. **Same—Pleading.**

   In an action by one stockholder against another, a complaint which alleged that the corporation had a certain amount of capital stock for sale of which each stockholder had a right to purchase a part in proportion to the stock held by him, and that defendant caused to be issued and sold to himself a large number of shares in excess of his proportional part, but which failed to show that defendant had not acquired a right to such excess by purchase from some other stockholder or otherwise, is insufficient to allege a wrongful conversion of the stock by defendant.

4. **Same.**

   In an action by one stockholder against another a complaint which alleges that the corporation had a certain amount of capital stock for sale, of which each stockholder had a right to purchase a part in proportion to the amount of stock held by him, but that defendant caused to be issued to himself a large number of shares in excess of the number he was entitled to purchase, and thereby plaintiff was unable to obtain the stock he was entitled to, although he was at all times ready, able

and desirous to subscribe and pay for the same, but which fails to allege that he ever offered to subscribe for the same and was refused, and which fails to show what disposition was made of the balance of the stock which was more than sufficient to have supplied plaintiff, is insufficient to state a cause of action against any person as the allegations are entirely consistent with a forfeiture or abandonment of his right to purchase.

5. Corporations — Stockholders — Right to Purchase Stock — Waiver.

Where a stockholder of a corporation having a right to purchase a proportional part of stock offered for sale by the corporation fails to assert his right within a reasonable time, he will be deemed to have abandoned his right.

6. Corporations—Stockholders—Preference Right to Purchase Stock.

The original stockholders of a corporation have a preference right to purchase the original stock of the corporation which remains untaken at the time of the incorporation, or new stock in case of an increase of the capital stock, pro rata, according to the amount of stock held by each stockholder, but such preference right does not extend to capital stock which has been issued and paid for and retransferred by the stockholders to the corporation as part of its general assets.

7. Same.

Where the stockholders of a corporation transferred to the corporation to be used as general assets part of the stock held by them, the fact that the officers of the corporation reported such stock as unissued stock could not change its character from issued to unissued stock so as to give to the stockholders a preference right to purchase the same.

*Appeal from the District Court of El Paso County.*

Messrs. PATTERSON, RICHARDSON & HAWKINS and Messrs. LUNT, BROOKS & WILLCOX, for appellant.

Mr. JOSEPH W. ADY, Mr. ROBERT E. LEWIS and Messrs. DINES & WHITTED, for appellee.

THOMSON, J.

Walter F. Crosby brought this suit against Winfield S. Stratton to recover damages from the latter for the alleged wrongful conversion by him of stock

in The Portland Mining Company, to which the former averred himself to be entitled. The complaint set forth as follows: That the entire capital stock of The Portland Mining Company, a corporation consisting of 3,000,000 shares of the par value of one dollar each, was, at the date of the organization of the company, issued, fully paid and non-assessable, in consideration of certain mining property then conveyed to the corporation; that afterwards, and prior to the 17th day of April, 1894, the stockholders of the company, of whom the plaintiff was one, transferred to the company 704,000 shares of this stock, to be held for its use and benefit, and to be part of its general assets; that this stock was not reported by the officers of the company as issued or outstanding, but as substantially unissued stock, not constituting part of the outstanding stock of the company; that the then stockholders, by virtue of their holdings, had each an undivided interest and right of property in and to the stock so turned into the company's treasury, equal to his proportionate ownership of the outstanding stock of the corporation; that on the 17th day of April, 1894, the plaintiff was the owner of 120,000 shares, and the defendant was the owner of 215,000 shares, of the then outstanding stock, and that the defendant then was, and continued to be, a director of the company; that on the last named day, the directors of the company, by resolution, authorized and directed the sale of the 704,000 shares which had been transferred to the company, for the price of twelve and one-half cents per share, for the general purposes of the corporation; that by virtue of the property of the stockholders in the stock so ordered to be sold, each stockholder, as incident to his ownership of outstanding stock, had the right to subscribe for, and to have allotted and issued to him, shares of the stock so

ordered to be sold, in proportion to his then holdings; that of such stock the plaintiff was entitled to 65,000 shares, and the defendant to 117,424; that by reason of his office as director, and of his participation in the offer of the stock for sale, and the sale, the defendant was well acquainted with the rights of the stockholders in the stock to be sold, but nevertheless caused to be issued to himself 208,000 shares, an excess of 90,576 over the number to which, as a stockholder, he had any right; that of those 90,576 shares, the proportion to which the plaintiff was entitled, was 28,641 shares; that the plaintiff was on the 17th day of April, 1894, and has ever since been, ready, able and desirous to subscribe for, and have allotted to him, those 28,641 shares, but by reason of the wrongful act of the defendant in causing them to be allotted to himself, and holding and retaining them from the plaintiff, the latter has been unable to subscribe for, have allotted to him or receive those shares, or any of them, or any stock in lieu of them, and that on the 10th day of January, 1898, the plaintiff tendered to the defendant twelve and one-half cents per share for each of the 28,641 shares, and demanded their delivery to him, but the defendant refused to comply with the demand. Judgment was demanded for $57,282, the alleged value of the stock withheld, and $13,461.27, the amount which the defendant was averred to have received as dividends earned by that stock. To the foregoing complaint a demurrer was sustained, and the plaintiff declining to amend, judgment was entered against him, and he appealed to this court.

The theory of the plaintiff, as outlined in the argument of his counsel, is that the stock transferred to the company, or, following an expression of counsel, covered back into the treasury of the company, became a fund, in the specific property constituting

which, all the stockholders were interested; that when the stock was offered for sale, it was the right of each stockholder, upon payment of the price, to receive such number of shares, as upon a division of the stock among the stockholders in proportion to their respective holdings, would be allotted to him; and that when the defendant received 90,576 shares in excess of the number to which he had any right in virtue of his holdings, he took 28,641 shares to which a calculation of the plaintiff's proportionate interest in such excess, shows the latter to be entitled. We shall first examine the complaint to see whether, on the plaintiff's theory that, as a stockholder, he had the right to subscribe, pay for and receive, a certain portion of the stock which had been transferred to the company, it states a cause of action against the defendant; and we shall afterwards inquire into the soundness of the theory.

1.  Counsel say that the alleged conduct of the defendant amounted to a wrongful conversion of the plaintiff's property, and in support of his claim to a recovery, they refer to some authorities which we shall notice later. It is now well established that shares of stock in a corporation, may, like any other species of personalty, be the subject of conversion. Whether, in a given case, there is a conversion or not, is dependent upon the nature of the plaintiff's right in the property, and the character of the act constituting the alleged conversion. To sustain trover, there must be in the plaintiff at the time of the supposed conversion, a lawful possession, or the right to immediate possession. There must be an invasion of a legal, as contradistinguished from an equitable, right. There can be no conversion of property, the title to which consists only in the right at some future time to acquire it by purchase.—*Wilson v. Wilson,* 37 Md. 1; *Wheeler v. Train,* 3 Pick. 254;

*Clark v. Draper,* 19 N. H. 419; *Winship v. Neale,* 10 Gray 382; *Forth v. Pursley,* 82 Ill. 152; Greenleaf on Evidence, § 637.

A conversion consists of some act of dominion exerted over one's property, in denial of his right, or inconsistent with it.—Cooley on Torts, 448; *Smelting & Refining Co. v. Tabor,* 13 Colo. 41.

At the time of the alleged conversion by the defendant, the plaintiff had no right, or shadow of right, legal or equitable, to any specific shares of stock in the treasury of The Portland Mining Company. The most that can be claimed in his behalf is that he was entitled to go to the company's office, subscribe for a certain number of shares, pay into the treasury twelve and one-half cents per share for the number taken, and receive a transfer of the legal title. But he had no right to demand any particular shares; and until he should offer to subscribe and pay, he was as destitute of interest in the stock as a stranger to the company. He had no better claim upon the shares the defendant received, than upon the shares any other person received, if stock was sold to any other person. In his complaint he described his interest as an *undivided* interest in the entire 704,000 shares which the stockholders turned into the treasury; and it is not in virtue of possession or right of possession in himself, but in virtue of the result he has reached in working out an arithmetical problem, that he claims to be entitled to 28,-641 shares of the stock issued to the defendant.

The following are the cases to which we are referred for the plaintiff, and on the authority of which it is claimed that a conversion of the plaintiff's stock by the defendant appears from the facts stated in the complaint.—*Payne v. Elliot,* 54 Calif. 339; *Budd v. Multomah Co.,* 12 Ore. 271; *Kuhn v. McAllister,* 96 U. S. 87.

We suppose those cases come as near supporting the plaintiff's contention as any that can be found; but they afford it no support whatever. In each case, ownership, or actual possession, of specific stock in the plaintiff, and a wrongful conversion by the defendant of that identical stock, was averred. The finding in *Payne v. Elliot* was that the plaintiff delivered the stock to the defendants to hold as security for $409 which he owed them. In *Kuhn v. McAllister*, the allegations were that the plaintiff was the owner of 250 shares of the paid up capital stock of the North Star Silver Mining Company, represented by five certificates for fifty shares each, and that the defendant without his consent and wrongfully, took those shares and converted them to his own use. In *Budd v. Multomah Co.*, the allegations were to the same effect.

But giving the plaintiff the benefit of his contention that the defendant would, by causing treasury stock to be issued to himself in excess of his rightful share, be guilty of a wrongful conversion, we find nothing in the complaint to indicate that he did actually take more than his rightful share. It is true the complaint says that the plaintiff caused to be issued to himself shares largely in excess of the number to which he was entitled according to his holdings as a stockholder in the company. But because he received more than the amount to which his holding of stock would entitle him, it by no means follows that he received more than the amount to which, as a matter of fact, he had a right. He may have purchased the share of some other stockholder in the treasury stock, and caused that to be included in the certificate or certificates issued to him; and outside of his purchase, he may have received only what his previous holding would authorize. Where a hypothesis exonerating the defendant from liability is con-

sistent with all the allegations of the complaint, the pleading is bad.—*Hallack v. Bank,* 14 Colo. App. 79.

If, however, the plaintiff had the right to purchase the stock, and the directors or governing body, no matter for what reason, refused to receive his subscription and his money, an action would lie in his favor against some person—presumably the corporation.—See *Dousman v. Mining & Smelting Co.,* 40 Wis. 418; Sedgwick, J., in *Gray v. Bank,* 3 Mass. 363.

But it does not appear from the complaint that the plaintiff ever offered to subscribe, or that any obstacle in the way of his purchase was ever interposed by any one. The complaint says that on the 17th day of April, 1894, and ever afterwards, he was ready, able and desirous to subscribe and pay for the 28,641 shares, but that because the defendant wrongfully had those shares issued to himself, plaintiff was unable to obtain them, or any other stock in their place. The defendant took 208,000 shares. The total number ordered sold was 704,000 shares. After the defendant made his purchase, 496,000 shares remained. It does not appear that this remainder was ever sold. But the plaintiff says that the act of the defendant in taking 208,000 shares, rendered him unable to obtain any of the balance. Without explanation, as a statement of cause and effect, that allegation is an absurdity. As the plaintiff has given us the facts in his complaint, he had ample opportunity to offer to subscribe for the stock. But he could not be compelled to subscribe. The officers of the corporation could not know whether he proposed to exercise his right or not, unless he indicated his purpose so to do. If he had the right, it was his duty to assert it within a reasonable time, otherwise it became forfeited.—1 Cook on Stockholders, § 286; 1 Morawetz on Private Corporations,

§ 455; Sedgwick, J., in *Gray v. Bank,* 3 Mass. 388, 389.

That the plaintiff voluntarily abandoned his rights in the stock, and has, therefore, in relation to it, no ground of complaint against any person, is entirely consistent with all the allegations of the complaint.

2. We come now to an examination of the underlying theory of the case. Had the original stockholders of the corporation any right, in law, to a preference over strangers in the purchase of the 704,000 shares they had transferred to the company, or had one stockholder any preference over another in the purchase? Such preference does exist in relation to original stock which remains untaken, and therefore unissued, at the time of the incorporation; and in case of an increase of the capital stock, each of the first stockholders has the right to subscribe for and purchase his *pro rata* share of the new stock. One reason on which the rule in either case rests, is that the stockholder has the right to preserve the proportionate interest in the corporation first acquired by him. To dispose of the unissued or added stock to strangers, or to other stockholders, without affording him an opportunity to take his *pro rata* share, would be, without his consent, to impair his interest and influence in the corporation, and diminish the relative value of his holdings; and this the directors, who are trustees for the stockholders, may not lawfully do.—*Agricultural Society v. Eichholtz,* 45 Kan. 164; *Jones v. Morrison,* 31 Minn. 140, 153; *Eidman v. Bowman,* 58 Ill. 444, 447; *Reese v. Bank,* 31 Pa. St. 78; Sewell, J., in *Gray v. Bank, supra; Atkins v. Albree,* 94 Mass. 359; Angell & Ames on Corporations, § 554.

But because, to prevent impairment of their interests, corporators have a preference in the pur-

chase of unissued or new stock, it does not follow that they have any right over strangers in the purchase of stock which has been paid for and issued, but transferred back to the corporation as part of its general assets. Their right in the one case is founded on reasons which have no existence in the other. The issued stock of a corporation represents its paid up capital. The holder owns it and disposes of it as he sees fit, and if it finds its way back into the treasury of the corporation, it becomes assets in the same sense that the corporation's other property is assets. It is still part of the paid up capital; and its sale no more affects the value of the other stock, or the standing of the stockholders in the corporation, than the sale of the corporation's tools or machinery. The relative value of all the stock is the same whether the particular stock of which we are speaking remains in the hands of the original holders, or has been acquired from them by the corporation, and placed in its treasury. In the case at bar, the entire authorized capital stock of the company had been issued and paid for in full. The holders transferred a certain portion of it to the company, for what purpose is not explicitly stated, but upon a fair presumption from all the averments in the complaint, to be sold, and the proceeds used in the development of the company's property to the enhancement of the value of the remaining shares. The complaint says that it was to be held for the company's use and benefit, and as part of its general assets. If that language means anything, it means that the stock was to be used like the company's other assets, in furtherance of the objects of the corporation. And further on the complaint states that it was ordered to be sold for the general purposes of the company. It was paid up stock when it was in the hands of the holders, and by its transfer to the company its character was

not changed. The complaint says "that said stock was not, and was not reported by the officers of said company as issued or outstanding, but as substantially unissued stock not constituting part of the outstanding capital stock of the company, and the issue of said stock, at any time, making it participate in the assets, dividends and control of the said company, would decrease the *pro rata* participation of the other stockholders in said company in the same ratio as the number of said unissued shares bore to the total capitalization of said company." One portion of the above we do not understand very well, and the other portion we do not understand at all. How a report by the officers of the company, whatever it might be, could make issued stock unissued stock, or could reverse the effect of facts, is what we fail totally to understand; the complaint furnishes no solution of the difficulty, and in the absence of explanation, we must remain of the opinion that the character of the stock was unaffected by the report. If by the succeeding language is meant that the reissue of the transferred stock would have the same effect upon the value of individual holdings that would follow an issue of new stock, or of original, but hitherto untaken stock, then the pleader has given us the statement of a false proposition. It is true that by parting with a portion of his stock, the influence of the holder at corporate elections would be diminished, and in case of dividends, he would receive less money; but the relative value of each individual share would remain the same. The amount of issued stock would not be changed; and the proportion between each issued share and the total number of issued shares, would be preserved. This would not be the case if dormant stock were released, or existing values lowered by a dilution of new stock. The evident purpose of the transfer to the company was

to enable it to raise money for the purposes of the enterprise in which it was engaged. If the stockholders had sold their stock on the outside for twelve and one-half cents per share, and paid the money into the company's treasury, the desired result would have been accomplished as effectually as by the method which was employed. It is altogether immaterial whether the stockholders sold the stock themselves, or turned it over to the company to be sold. In either case they parted with all their interest in the stock, and put its further disposition entirely beyond their control. So far as our research has extended, the authorities are unanimous that where stock, once issued, returns to the possession of the corporation, upon its reissue and sale the right of purchase of stockholders and strangers is the same.—*Hartridge v. Rockwell,* R. M. Charlton, 260; *State v. Smith,* 48 Vt. 266; 1 Morawetz on Corporations, § 455; 2 Thompson on Corporations, § 2100.

In *Kimmell v. Geeting,* 2 Grant's Cases, 125, there was a fraudulent combination and conspiracy among the defendants, who were the managers of the Sunset and Bedford Turnpike Co., to divide among themselves stock, the purchase of which for the benefit of the corporators, they had directed by resolution. This case, although relied on by the plaintiff, is not in point. No conspiracy or fraudulent practice is charged in this complaint.

The demurrer was properly sustained, and the judgment will be affirmed. 　　　　　*Affirmed.*